**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**and**

**Enid Roth, Plaintiff–Intervenor,**

**v.**

**NATIONAL BROADCASTING COMPANY, INC., Defendant.**

**No. 86 Civ. 1121 (RWS).**

United States District Court, S.D. New York.

Dec. 7, 1990.

E.E.O.C., James L. Lee, Regional Atty. (Ann Thacher Anderson, Deborah Reik, of counsel), New York City, for plaintiff.

Vladeck, Waldman, Elias & Engelhard, P.C. (Anne C. Vladeck, Debra L. Raskin, of counsel), New York City, for plaintiff-intervenor.

Proskauer, Rose, Goetz & Mendelsohn, (Howard L. Ganz, Andrew P. Marks, of counsel), New York City, for defendant.

## OPINION

SWEET, District Judge.

Plaintiff Equal Employment Opportunity Commission ("EEOC") and plaintiff-intervenor Enid Roth ("Roth") brought this action against the defendant National Broadcasting Company, Inc. ("NBC") alleging a violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. 2000e *et seq.* ("Title VII"), arising out of NBC's refusal to employ Roth as a staff director of television programs for NBC Sports. Upon a trial before the court and the submission of final argument and briefs the following findings and conclusions were reached, upon which judgment will be entered in favor of NBC and dismissing the complaint of Roth.

*The Parties*

EEOC is the agency charged with the enforcement of Title VII. After hearings and an investigation, it issued a right to sue letter to Roth on July 13, 1983.

Roth, a woman, was hired by NBC in 1952 as an executive secretary, became a production assistant, an associate producer,

a producer, an associate director and a director in the News division.

NBC, a Delaware corporation, operates a television network, local television stations and presents performances and events on television.

*Prior Proceedings*

In 1975, a group of female employees commenced a class action against NBC, *Women's Committee for Equal Employment Opportunity (WC=EO) v. NBC,* 71 F.R.D. 666 (S.D.N.Y.1976). The class was certified to include, *inter alia,* "all women who were employees of [NBC] on or after February 8, 1972" and EEOC was permitted to intervene as a plaintiff. *WC=EO v. NBC,* 71 F.R.D. 666, 668 (S.D.N.Y.1976). Although Roth was not a named class representative, she was a member of the class under its definition. On August 31, 1977 the parties entered into a Consent Decree which, among other things, resolved in full all claims against NBC by members of the plaintiff class for sex-based discrimination in violation of Title VII up to and including March 28, 1977.

The Decree established "utilization goals," percentage goals for the utilization of women, to be achieved by NBC by the end of 1981. These goals covered various salary grade positions and the job category of associate director. In the salary grade ranges, the overall utilization goals were combined with subgoals, covering certain functional areas or divisions of the overall categories. For example, for Grades 22–24, the Decree specified

> Ultimate overall utilization goal of 27%, with the provision that there be a minimum utilization goal of 25% in the News Division, 20% in the Finance Division, and 15% in the TV Network Division.

With respect to the associate director position, the overall utilization goal of 30% was not joined with any kind of sub-goal for functional areas or divisions.

The Decree also required NBC to request all women employees to complete or update certain forms describing their experience and career interests and objectives, and to consult these forms (or a catalogue based thereon) when filling certain job vacancies.

On May 13, 1980 following certain of the events set forth below, the Directors Guild of America ("DGA") filed a charge of discrimination with the EEOC against NBC, alleging that NBC had discriminated against Roth because of her sex by refusing to hire her to direct television sports programs. The DGA subsequently amended the charge to include NBC's failure to offer another woman an Associate Director position in Sports.

The EEOC investigated the charge, and on July 13, 1983 issued its determination that there was "reasonable cause" to believe that the NBC sports department ("Sports") had discriminated against Roth in particular and females as a class based on their sex in filling Sports Director positions. In part, the determination stated:

> In summary, Respondent has asserted that it has not employed Enid Roth as a Sports Director because she lacks the required experience, knowledge and training. However, it is clear that Respondent has also denied her the opportunity to be trained in sports programming. Also the employment histories of four of Respondent's six male Sports Directors does not reflect the overwhelming amount of knowledge, experience and training which Respondent asserts is required. Enid Roth, with her vast amount of directorial experience is arguably as qualified, if not more so, than several of the male Directors who were hired.

With respect to the portion of the charge relating to Associate Directors in Sports, the EEOC determined that there was not sufficient cause to believe the DGA's allegation of discrimination based on sex.

After the reasonable cause determination was issued, NBC requested reconsideration, claiming again the Consent Decree as a jurisdictional bar, and again asserting that the process by which one becomes a Sports Director at NBC was a "pipeline" process: "talented personnel are exposed to increasingly more responsible sports assignments before being made sports director." The EEOC declined this request.

Thereafter, in 1986, this action was commenced by the EEOC, and in 1987 Roth was granted permission to intervene. Discovery proceeded, and upon the elevation of the Honorable John M. Walker to the Court of Appeals the action was reassigned. An order was entered defining the scope of the EEOC proceeding and permitting proof at trial relating to the alleged denial by NBC of training assignments and freelance opportunities for Roth. Evidence of pre–1977 events—events covered by the Consent Decree—was deemed admissible to enable plaintiffs to establish NBC's intent.

The action was tried by the court from April 16 through April 23 and on May 2, 1990, and after a full briefing by the parties' final argument was heard on August 2, 1990.

### THE FACTS

Based upon the undisputed facts set forth in the Pretrial Order and upon the testimony and exhibits offered at trial, the following facts are found to have been established by a preponderance of the evidence.

*The Categories of Employment at Issue*

The Staff Sports Director of a television sports program ("the Sports Director") is responsible for the image of the sports event which is broadcast by the television station. The Sports Director accomplishes this task by determining which picture to select from those transmitted by the various cameras to the control truck in the course of the event, which is presumably spontaneous and unscripted. In this respect, a sports event is unlike a live news event such as a political convention. Viewers of a sports broadcast expect "standard" shots and angles for standard plays and can be intolerant of deviations or lapses, even in the face of unpredictable occurrences. For a live news event, however, there are few if any "standards" to which the director must adhere, and viewers must accept more variation between different events and different directors. The selection of the pictures to be transmitted thus requires a knowledge both of the technical capacity of the equipment involved and of the likely course of action of the event. The Director must anticipate the action and direct the cameras and the truck personnel in order to be ready to present the appropriate shots. A Sports Director must possess skill, judgment, creativity and leadership.

The Sports Director is under contract with NBC and is the highest paid of all types of directors, receiving about twice the salary of those who direct news programs, which are generally somewhat less spontaneous and more scripted than sports events. In 1982, for example, the average news director made 30% of the salary of a Sports Director, reflecting both the increased skill required to direct sports programs and the fact that sports programs are the most profitable programs aired by NBC. During the period at issue in this action NBC produced approximately 400 sports events. No woman was ever hired as a Sports Director.

An Associate Director performs those tasks assigned by the Sports Director, frequently being responsible for the handling of commercials, station breaks and the like. The Associate Director performs these tasks in the control truck. By 1980, 14% of the Associate Directors in Sports were women. As of January 1980, three of the eight Associate Directors hired for the 1980 Moscow Olympics were women.

A freelance director performs the same duties as a Sports Director but does not have a long term contract, nor is the freelance director an employee of NBC Sports, but rather an independent contractor. A freelance director is sometimes hired for out of town assignments with a local or regional interest. Between 1979 and 1982 no women were hired by NBC as freelance directors.

Roth was the only woman who ever sought the position of Sports Director at NBC Sports during the period in question. In 1982 or 1983, Mary Buta, an Associate Director in Sports who was frequently upgraded temporarily to Sports Director, asked to direct a football game. The request was made in the middle of the football season, and her supervisor responded

that the schedule would not allow such assignment until the following year. Although Buta worked on live events as an Associate Director, she had not thereafter asked for an opportunity to direct live events.

*The Hiring Practices of NBC for the Post of Director*

Since 1979, NBC advertised open positions of Sports Director by means of postings on bulletin boards indicating that interested applicants could apply by submitting written applications. During the relevant period there were fewer than ten Directors employed. None were women.

From 1979 to 1985 there were in the number of 200 freelance directing opportunities which were reported to the DGA. Several dozen different freelance directors were hired during the relevant period.

*The Roth–NBC Relationship Prior to the Final Refusal to Hire Her as Sports Director*

Roth joined NBC in 1952 as an executive secretary, gradually moving up to become a production assistant, an associate producer, a producer, and an associate director. She worked as a control room associate director for Sports during the period 1955–57. On occasion while she was on staff as associate director she was upgraded to perform director functions for programs other than sports. For example, she was upgraded for coverage of the primaries and conventions in 1964, Lucy Baines Johnson's wedding, and the conventions in 1968. Directing such programs required technical knowledge but no knowledge of sports or the degree of camera control and direction required in sports.

In 1976 Roth became a director on staff at WNBC–TV. She directed the news in virtually all of the time slots. In 1976, Roth directed NBC's national election coverage, including the primaries, the conventions, and election night. In publicizing Roth's abilities, and NBC's use of women for its election coverage, NBC announced:

What makes one network's coverage of an election year better than any other? (NBC News' has been tops in critical acclaim and in the ratings).

Part of the difference is Roth. The only woman currently directing network coverage of Election Year '76, Roth's responsibilities through Election Night are to oversee the content and concept of NBC News' special coverage.

Throughout her years as a director on staff at NBC in the news division, Roth also accepted freelance assignments, including many for the position of associate director, utilizing vacation time or requesting leaves of absence from NBC to enable her to do so. One of those freelance associate director assignments involved a sporting event—a college basketball game broadcast on cable television sometime between 1968 and 1970. In 1973 Roth rejected an offer to become a Sports Director at HBO in part, at least, because of the possibility of risking her DGA status.[1]

Roth was chosen to work on the Tony Awards as the only associate director for that show for each year from 1971 through 1987. In addition, Roth worked as an associate director in 1983 and 1984 for many shows, including "Night of 100 Stars," "Parade of Stars," "Night of 100 Stars II," and "Sinatra, The Man and His Music." Roth received awards and nominations for awards for her work as associate director and director.

During at least some portion of the period of Roth's employment at NBC the network was precluded from assigning women to the sites of sporting events by virtue of restrictions imposed by stadium owners or

---

**1.** The risk was due to the fact that HBO was not a signatory to the DGA's agreement with television networks and the DGA had a rule permitting its members to work only for DGA signatories. However, prior to 1978 the DGA had not enforced that requirement with respect to HBO, for the purpose of "enabling HBO (and pay television generally) to become established." In May, 1978 "the Guild announced to its members that it had decided thenceforth to enforce its constitution's prohibition against working for nonsignatories in pay television. It specifically informed its members that they could no longer work for HBO...." *Home Box Office, Inc. v. Directors Guild of America, Inc.,* 531 F.Supp. 578, 583–84 (S.D.N.Y.1982), *aff'd,* 708 F.2d 95 (2d Cir.1983).

operators or by the professional sports leagues themselves. At some time in the mid-sixties, after Roth learned of a court ruling that women journalists were not to be excluded from coverage of sporting events by being barred from locker rooms or press boxes, she requested assignments with Sports. Roth testified that her interest in sports arose from her frequent attendance at "ladies' days" at Ebbets Field, having swam and played tennis at summer camp and thereafter, and her participation in soccer and field hockey as part of physical education programs during her school years. In response to her requests for assignments in Sports, Roth was told to speak to Scotty Connall ("Connall"), the then Executive Producer of NBC Sports. She did so, and Connall told her that he would look into her request, but he never got back to her.

In or around 1970 Roth went with Ernie Ricca ("Ricca"), who was then Eastern Executive Secretary of the DGA to meet with Richard Goldstein ("Goldstein") of NBC's Labor Relations Department. At that meeting the fact that there were no women in Sports at NBC was discussed. Goldstein, although saying that he had been unaware of the situation, conceded that it would be inappropriate for NBC to have no women in Sports. Goldstein asked for time to look into the situation and when Roth and Ricca returned to him some time after the meeting, he again asked for more time. After making repeated attempts to discuss the situation further with Goldstein, Roth was given an Associate Director assignment on a baseball game in 1973. Roth was told by the producer of the game that he was very pleased with her performance, and she asked when she would get another chance. She was given no further assignments in Sports even though she was told she had done "a fine job." Roth then made an appointment to see Carl Lindeman ("Lindeman"), at that time the head of NBC Sports, but Lindeman's employment was terminated prior to the time of Roth's appointment with him.

Roth also spoke to Ted Nathanson ("Nathanson"), a Director and coordinating producer of football, about her interest in getting a job in Sports. Nathanson suggested that Roth observe a game while he directed, and she offered to accompany him on her own time and at her own expense. According to Nathanson it was unusual for someone to be willing to pay her own way. However, Roth was not permitted to go with Nathanson to observe a game. NBC later told the EEOC that permitting Roth to observe would have been impractical, a potential violation of law, and inconsistent with the manner in which other sports directors received their training.[2]

In late 1976 NBC had acquired the rights to broadcast the 1980 Olympic Games in Moscow, and in 1977 Donald Ohlmeyer ("Ohlmeyer") was hired specifically for the position of Executive Producer of those Olympics. Ohlmeyer had worked for ABC as a production assistant, associate director, and Director, ultimately became the producer of ABC's major sports telecasts— including Monday Night Football, major league baseball, and Wide World of Sports. In addition, Ohlmeyer had worked in one capacity or another on ABC's coverage of five different Olympic Games.

In 1978 Roth attempted to meet with Ohlmeyer, but her repeated efforts failed. She put together a photographic presentation for him with the request that he meet with her. Although Roth was told that Ohlmeyer found her presentation terrific, and that no one else had ever gone through such hoops to see him, she still could not get an appointment to be interviewed by him, even though at this time, early in Ohlmeyer's tenure at NBC, he was hiring a number of new people for Sports. Roth ultimately waited on a staircase leading to Ohlmeyer's office in order to get him to interview her. Roth informed Ohlmeyer that she sought a job as a Sports Director, and suggested that she do a tape for him so that he could review her work. In their brief interview, Ohlmeyer did not request

---

**2.** However, it appears that at least some of the other people hired as Sports Directors during the period in question were given the opportunity to observe a Sports Director in action prior to taking on any responsibility.

such a tape. There was some discussion of sports and of her background. With respect to an associate director's position, Roth gave Ohlmeyer the impression that she would consider such a post a demotion. Ohlmeyer declined to hire Roth as a Sports Director and did not get back to Roth at any time after he met with her, although she understood that he had undertaken to do so.

Roth spoke with Arnie Reif ("Reif"), who had a management position with NBC Sports, about the possibility of working as an associate director in Sports and then with Glen Gumpel ("Gumpel"), the Western Executive Secretary of the DGA.

In late 1978 Gumpel met with Eugene McGuire ("McGuire"), who was then in charge of labor relations for NBC, in order to discuss Roth's prospects for employment in the Sports Department. Gumpel understood that, at that time, there were opportunities for directors and associate directors because of the hiring being done for the summer Olympics.

Gumpel discussed with McGuire the fact that women were not given opportunities at NBC Sports, and he informed McGuire that it was a good time to rectify that wrong. Gumpel was told that McGuire could not do anything for Roth and that the best he could do was to have Roth send her resume to someone who was responsible for looking at resumes for NBC with regard to the 1980 Olympics. Gumpel was given no further reason for NBC's refusal to give Roth an opportunity for an interview. Roth had on a number of occasions spoken with various NBC personnel about a job in Sports, and DGA representatives also made an additional number of similar requests.

After a series of letters between Gumpel and NBC, Gumpel advised Roth that the most appropriate action was for her to file a charge of discrimination with EEOC; as a result, the Charge of Discrimination referred to above was filed on May 13, 1980 claiming discrimination arising out of the refusal to hire Roth as Director.

After the reasonable cause determination of July 13, 1983, Roth and her attorney met with Arthur Watson ("Watson"), President of NBC Sports and Roberta Romberg ("Romberg"), then Vice President of Personnel. Following a discussion between Romberg and Roth's attorney concerning Roth's desires, Watson arranged for Roth to meet with Michael Weisman ("Weisman"), at that time the executive producer of NBC Sports.

A "plan of action" was devised for Roth which included having her observe sports events directed by Sports personnel. Romberg advised Weisman to keep a file and notes.

Weisman then met with Roth. At no time during this meeting or thereafter did Weisman ask to see a tape of Roth's work or her resume. The purpose of the meeting and the plan of action was to enable the Sports management to determine Roth's qualification for employment as a Director. Weisman was eager to see Roth succeed since he wanted to bring women into Sports generally.[3]

After discussing Roth's background, Weisman concluded that because she had "zero sports experience" and her background was in studio directing, the best way to start would be to have Roth direct a sports studio show. Weisman suggested this as a good entree into NBC Sports because it would allow Roth to get comfortable with the people and terminology in sports. Roth, however, declined the offer, saying that she wanted to direct live sporting events. Weisman also suggested that Roth start by doing football, because it was, in his view, easier to direct than baseball. Roth stated that she was a baseball fan, that she loved and knew baseball and was quite confident that she was ready to direct baseball. She declined Weisman's suggestion.

After this meeting, Roth was told she would be sent to observe the broadcasting of one or more baseball games. She called Harry Coyle ("Coyle"), a long-time acquaintance who was then coordinating producer

---

3. Weisman was a credible witness at trial, noting he was no longer with NBC having, been

"fired, booted, kicked out," as he described the press reports about his departure.

of baseball and asked to talk to him about his expectations of directors and to review his "bible," a comprehensive guide to baseball television production. Coyle did not want to talk to Roth or show her his "bible," and asked Weisman to intervene on his behalf. Weisman told Roth the "bible" would not be useful to her, because it related to the direction of a major game, such as in the World Series, in which as many as 20 cameras, 14 tape machines and over 100 people might be used.

Roth observed four baseball games during the summer of 1984. The games were directed by Brent Gunts ("Gunts"), Andrew Rosenberg ("Rosenberg"), and John Gonzalez ("Gonzalez"). Weisman testified that the purpose of these observations was for Roth to observe Sports Directors. However, he also asked to be provided with written evaluations of Roth's "performance" from those who were working on the broadcasts. A request for a report of how well an observer observed was unique to Roth's situation.

The evaluations of Roth following her observations which were submitted to Weisman included one from Kenneth Edmundson ("Edmundson"), the producer of a game directed by Gunts, which stated in its entirety:

On August 10th & 11th Enid Roth observed director Bucky Gunts in Toronto. Since Ms. Roth was there observing Bucky, her questions were directed to him. As far as I could tell she appeared to be eager and willing to learn. Other than that I don't think I'm in a position to offer any comment.

Gunts' memorandum concerning the same event stated:

... She was interested and attentive ... she seemed to understand the basics ... All in all, I would recommend at least one more observing experience for Enid.

Gunts testified on the subject as follows:

You can cover a baseball game very simply by staying on one camera. You will be able to see everything. It's the intercutting that makes a well directed game. You have to anticipate what's happening ...

If there's a man on first base, you have to know whether this guy is a threat to run or not. You have to know the players. Not everybody on the team is a threat to run ... You have to know that, as a director, whether the pitcher is going to throw over and try to hold him on first base.

If this guy's going to steal, if he steals, you have to be prepared to go to the right camera and you have to isolate on this guy, on the runner. There's a lot of stuff involved with a possible runner on first base.

Gonzalez testified that the observation of Roth was not a fair test of her abilities to direct, but that she demonstrated knowledge of the television equipment. The other half of the job, which according to Gonzalez was sports knowledge, was not a subject about which he could make a judgment, positive or negative, on the basis of his experience with her. Rosenberg also testified that based on Roth's observation assignment he could not evaluate her abilities as a Sports Director. Gonzalez stated that she asked "lots of questions." The memorandum from the producer of Rosenberg's game, David Neal ("Neal") stated:

She was polite and did not ask many questions. The things she did ask seemed to reflect a basic knowledge of television production.

At the conclusion of the baseball observations, Weisman told Roth that he would "see [her] next year." She asked him about football, as she had understood that that sport was to be part of the observation process. She was then sent to observe three football games. No memoranda or evaluations were made relating to those observations.

One of those football games was directed by Mark Warner, a freelance director often used by NBC. According to Roth, Warner, who showed her diagrams and explained how to prepare for a game, had been immensely helpful. Roth also observed a game directed by Nathanson, a Director for thirty years. Like Warner, Nathanson tried to be helpful to Roth, and the two met in his office before the game to discuss

what, from a Director's perspective, he looked for in a football game.

Nathanson allowed Roth to direct the game for one quarter. After observing her direction, Nathanson concluded that she had "severe drawbacks" as a Sports Director, including her lack of knowledge of and feel for the game. Nathanson, who knew Roth well, told her that "she never spoke to the cameramen during the portion of the game she directed and just took pictures. [She] [d]id not direct the cameras." Nathanson, however, was more blunt with Weisman, flatly stating that Roth "did not show a lot of ability."

Over the months of Roth's observation and directing opportunities, Romberg had discussed Roth's performance with Weisman, Nathanson, and Coyle and had received copies of the directors' and producers' memoranda. After Roth had observed several football games and directed a portion of the game with Nathanson, Romberg met with Weisman and Nathanson to discuss how Roth had done at football. Nathanson expressed the opinion that Roth "didn't seem to get it . . . she didn't grasp the intricacies."

The consensus of NBC's directors and producers, including the coordinating producers of football and baseball, was that Roth was a "long way" from being able even to compete with any of NBC's current Sports Directors. Romberg noted in a November 1984 memorandum that Roth

> doesn't seem to have a feel for the action of the games, does not ask questions, does not seek out either tapes or people to get more steeped in how the games are covered. She is not a total disaster, but for someone who has been a local news director for as long as she has, she has a long, long way to go.

Nevertheless, because Roth had expressed the desire to do so, Weisman and Romberg decided to assign Roth to direct a full football game. It was tentatively concluded that she would not be hired as a Sports Director unless "she knocked the socks off everyone."

Roth was assigned to direct a football game in New Orleans in December produc-

ed by George Finkel ("Finkel"). Finkel had produced or directed thousands of sporting events, including seven Super Bowls and six World Series, and had won many prestigious awards, including three Emmys. First time directors were often assigned to work with Finkel because he also had substantial experience as a Director.

According to Finkel, Roth had done a "very mechanical" telecast and "tended to be a shot caller, rather than a director." According to Finkel, Roth "really didn't understand the subtleties of the game" and was "the weakest first-time director [Finkel] had ever seen. She had the weakest knowledge of sports and the weakest command of her crew," and Roth missed the final touchdown. Finkel also stated:

> . . . as a matter of fact, one of my biggest concerns of the telecast was the fact that there seemed to be—it didn't seem to matter to her at all that she had missed a touchdown, whereas obviously I had reacted very violently and as most sports production people would when you miss something. It was—it seemed to be a continuation of business as usual, you missed a touchdown so we go on the next play.

Weisman informed Romberg that Roth "was not a competent network quality sports director" and the efforts to work Roth into the "regular rotation" ended.

The next conversation Roth had with any official of NBC Sports related to the possibility of her working on the 1988 Summer Olympics. Terry Ewert ("Ewert"), the Coordinating Producer for the 1988 Summer Olympics, arranged an interview with Roth to discuss a possible position for her at the Olympics, although almost all of the positions were already filled and Ewert was to leave for Seoul in ten days. The suggestion that Ewert interview Roth was initially made by Greg Pavlis ("Pavlis") of NBC's labor relations department, who received a request for such an interview by the DGA.

At the interview, Ewert and Roth spent some time reminiscing about the time they worked together in news and then Ewert told Roth that there were no positions of

substance left open at that time. Roth told Ewert that she would take any available position, even a logger or runner.[4] However, Ewert testified that he did not take Roth's offer too seriously, because he did not think that it would make sense for NBC to take someone who was a news director in New York off duty to go to Seoul to run for coffee for the sports personnel there.

Instead, Ewert attempted to ascertain if Roth were really interested in an associate director's job. Before Roth left Ewert's office she asked him whether the interview was a "set-up," in other words, whether Ewert had agreed to the interview merely in order to reduce the appearance of discrimination or retaliation against Roth for her suit against NBC with no real interest in finding a position for Roth. Ewert denied that this was the case, and in fact denied any knowledge of the status of Roth's suit.

After their meeting, Ewert spoke to Roth by phone. He repeated and she confirmed that he had not made her a job offer and they again discussed available positions, specifically two associate director positions which Ewert had not yet filled, in weightlifting and cycling. Roth again told Ewert that she would do anything to be involved in the Olympic broadcasts.

Ewert reported his conversations to Weisman. He informed Weisman that Roth had stated that she would take any position, but Ewert and Weisman decided not to offer Roth a job. Ewert had decided to fill the two available associate director positions with other candidates which he thought had stronger qualifications that Roth: the person selected for weightlifting had worked for CBC, a Canadian television network, at the 1988 Winter Olympics, while the person selected for cycling, a woman, had both experience with respect to cycling and a recommendation from the Director of the event.

*Sports Directors Hired*

Seven individuals became Sports Directors during the period in question. Three individuals became directors without a great deal of previous experience: Gonzalez, Gunts and Rosenberg. The other four, Richard Cline ("Cline"), John Filippelli ("Filippelli"), Jay Hansen ("Hansen") and Robert Levy ("Levy"), had served for a number of years as Associate Directors and had frequently been upgraded to direct sports programs. As such, the latter four had background and experience substantially superior to Roth's.

Before his promotion to Sports Director in 1981, Cline had worked as an Associate Director in sports or on sports programs for some 10 to 15 years and during that period was called upon frequently to direct a variety of sporting events, both live and taped.

Filippelli began working for NBC in or about March 1974. As Associate Director for the radio network commencing in or about 1976 and continuing at least until his formal assignment to the television network as an Associate Director in 1977, Filippelli was routinely upgraded to TV Associate Director to work on the NBC Sports program "Grandstand". Filippelli became a Sports Director in June 1983. He served for less than two and a half years as a Sports Director before he was assigned in November 1985 to the position of producer.

Hansen was hired by NBC Sports as a production assistant in 1979, served as both an associate producer and Associate Director of sports programs, and in both of those capacities was nominated for an Emmy award. Hansen had approximately seven years of sports programming experience at NBC prior to his selection, in October 1986, as a Sports Director. Before he became a Sports Director, Hansen had received an industry award for his work as a director of NBC's coverage of the world track and field championships in 1983.

Levy became a Director in 1980 after he had worked for several years as an Associ-

---

**4.** A "runner" is a person who runs errands or does other menial tasks for broadcast personnel, while a "logger" is someone whose job is to review videotape and make a log of the contents.

ate Director and associate producer in sports. During that time, Levy had received a number of temporary upgrades to Sports Director. Considered a technical wizard, Levy was particularly adept at the post-production tasks required to shape sporting events recorded on tape into a cohesive television program, and possessed skills which Ohlmeyer found in short supply at NBC. Although the United States boycott of the 1980 Olympic Games in Moscow prevented NBC from using Levy's talents in that context, his skills were made use of in connection with NBC's sports anthology program, "Sportsworld," which presented both taped and live events in a single program.

The other three people who became Sports Directors during the time period in question were Gonzalez, Gunts, and Rosenberg. All three had had substantially less experience than Cline, Filippelli, Hansen and Levy in directing Sports prior to their appointments as Directors.

Gonzalez

After graduating *magna cum laude* from Memphis State University with a bachelor of arts degree in radio and television, Gonzalez was employed by WHBG–TV, an ABC affiliate in Memphis, as a director, and also in more "technical" capacities as a camera person and technical director and as the operator of a piece of equipment called a vidifont or chyron (equipment which superimposes graphics on a television screen during the course of a broadcast).

In 1976, leaving his family in Memphis, Gonzalez came to New York, expressed a desire to become a Sports Director, and accepted a position at NBC as a "vacation relief" engineer, a temporary position designed to last only for the duration of the summer vacation season.

NBC had just purchased its first vidifont/chyron machine, and Gonzalez was assigned as a graphics engineer. Because the vidifont was used principally in connection with NBC's telecast of sports on the road, Gonzalez spent the ensuing two years working almost exclusively on sports programs, providing statistics, and back-

ground data in graphic form during the course of broadcasts.

In 1978, at a basketball game in South Bend, Indiana, Gonzalez filled in for the Technical Director, carrying out the orders of the Director—such as switching from one camera shot to another. The Production Department was pleased with his performance and he was later offered a job in the Technical Department as a Technical Director or Technical Supervisor. He informed several production people about these offers and said that he wanted a job in Sports Production.

After Gonzalez worked on a golf tournament in Houston, Connall offered him an opportunity to work in NBC Sports as Associate Director or as Associate Producer. Gonzalez turned these offers down and said he wanted to be a Sports Director.

After discussing with Gonzalez his knowledge of sports and sports television, Donald Ohlmeyer ("Ohlmeyer"), the Executive Producer of the Sports division, hired Gonzalez as a freelance director. In this position, he was paid some $10,000 less than he had been earning as a graphics engineer, and about one-half of what he would have made had he accepted the proffered engineering promotion. Furthermore, in the freelance position Gonzalez had no insurance and pension benefits. As a freelance director, Gonzalez was nominated for an Emmy award for his direction of baseball and, by the end of the first year of that freelance arrangement (which had been structured as three-year agreement which could be cancelled by NBC at the end of any year), NBC hired Gonzalez as Sports Director.

Gunts

Gunts was hired by NBC in July 1979 as the director of one of the principal local news programs, the 6:00 p.m. newscast, for WNBC–TV, the local New York City station owned and operated by NBC. He directed that program on a regular, five-day-per-week basis for the ensuing four years and served also as the overall director for primary and general election coverage.

Before coming to NBC, Gunts had been employed for over five years by WBAL–TV in Baltimore, where, among other things, he directed a wide range of live and taped programs as well as that station's early and late evening newscasts. In addition, Gunts had worked for about a year and a half at KTAR–TV in Phoenix as the director of that station's daily newscasts and as the individual responsible for the on-air or visual "look" of those programs (*i.e.*, for such things as the openings of the show, the set design, the graphics, and special effects).

Gunts played several varsity sports in high school (including football and basketball), and, while attending Cornell University, was a member of a varsity lacrosse team that won a national championship. Additionally, for a period of about two years, Gunts coached football and soccer at the Friends School in Baltimore.

As a director of NBC's local news programs Gunts came to the attention of Marv Albert, who had worked for NBC since 1974 as both the sports "anchor" on those local news programs and as a play-by-play announcer and analyst for sporting events broadcast by the NBC network.

Albert worked with Gunts on several sports specials produced by the local station and found Gunts' work to be excellent. In addition, and not surprisingly in light of Gunts' background as an athlete, Albert and Gunts frequently talked sports. In Albert's view also, Gunts was considered the top news director at WNBC–TV.

One of the sports specials on which Gunts and Albert worked together involved the January 1981 Super Bowl, a special produced and directed by Gunts and broadcast not only by WNBC–TV in New York, but also by other stations owned and operated by NBC in various parts of the country.

Seeking an opportunity to direct sports, Gunts sent a tape of that January 1981 Super Bowl special to Ted Nathanson. Nathanson was then the coordinating producer of football for NBC Sports, as well as a Director of longstanding and substantial repute. Upon receipt of that tape, Nathan-son told Gunts that he was favorably impressed and would keep Gunts in mind if an opportunity to direct became available and inquired of Albert about Gunts. Albert reported that Gunts was a "superb director" who would handle "very well" any Sports Director assignment. Gunts was given opportunities to observe the directing of sports events, and was assigned to direct several football games on a freelance basis.

NBC utilized Gunts again on a freelance basis in 1982 and 1983, during which period he continued to work with Albert on sports specials for WNBC–TV, including one concerning the New York Jets which won a UPI award as the best sports show of the year.

In May 1983, NBC, by means of a job posting, announced the availability of a Sports Director position, for which the stated requirements were significant experience with TV sports, significant directing experience, and an extensive working knowledge of sports. Gunts filed a job posting application for this position. Weisman, who made the decision to select Gunts for this position, received favorable comments about Gunts not only from Albert but also from Terry Baker, the producer of WNBC–TV News, and Ron Kershaw, the executive in charge of local news.

Rosenberg

Prior to being hired by NBC in late 1978, Rosenberg had worked for six years as an assistant director and director of WBZ–TV in Boston and had directed a variety of studio and remote programs (including news and election coverage). He also served as the director and assistant director of Boston Celtics basketball games, New England Patriots football games, Boston Red Sox baseball games, and other sports programs, including a stint as director of professional bowling for HBO.

Prior to the 1980 Olympics, Rosenberg sent his resume to Ohlmeyer and secured an interview with him. Ohlmeyer offered him a position as a production assistant. Although that position called for Rosenberg to take both a reduction in title and a

15% cut in pay while simultaneously being required to relocate from Boston to New York, Rosenberg accepted. He did so, however, only after exacting from Ohlmeyer an agreement that he be given an opportunity while employed as a staff production assistant to direct on a freelance basis four to six sports programs.

NBC assigned Rosenberg to direct some 17 events between February and September 1980, principally of the kind as to which he had acquired experience in Boston, as well as three golf events, an Olympic Trials and a marathon. In October 1980, Rosenberg became a Sports Director.

NBC has engaged freelance directors frequently to cover an event when its regular staff directors are occupied elsewhere. For example, NBC has regularly retained Jim Cross who has worked as a freelancer for ABC and CBS as well as NBC. Similarly, NBC has hired as a freelance director Lou Rainone, who had acquired extensive sports directing experience in Cincinnati where he directed Cincinnati Reds baseball games.

Two members of NBC's engineering or technical staff, Lenny Stucker and Steve Cimino, have also had a limited number of freelance director assignments, Stucker directing 11 events between 1979 and 1985 and Cimino handling several.

Both Stucker and Cimino had for years been assigned regularly to sports not only as camera persons but also as technical directors. In this capacity, they would sit in the control truck next to the Sports Director at a sports event, including major events such as the World Series, Super Bowl, and NCAA college basketball championships, and would have the responsibility of implementing—if not anticipating—the Director's rapid-fire instructions involving different camera shots of unscripted action—action which might last for as little as one second.

The freelance assignments given Stucker and Cimino did not constitute a "stepping-stone" to the position of Sports Director, and they currently remain in engineering positions.

Other freelancers were used on some number of occasions and then phased out. Others, including even staff associate directors, were used on a few occasions, found wanting, and then not given additional assignments despite requests therefor.

Of the 14 individuals identified as having received freelance directing assignments between 1979 and 1982, five became staff directors—Cline, Filippelli, Gunts, Levy and Rosenberg, as described above.

*The Refusal to Hire Roth as a Sports Director*

Roth consistently sought the job of Sports Director and her actions constituted application for that job. No evidence was adduced that Roth expressly sought either an Associate Director position, except as set forth above with respect to the 1988 Olympics, nor a freelance assignment. The observation and directing opportunities provided Roth in 1984 were bona fide and developed with the participation not only of Roth but of her attorney as well. The treatment accorded Roth was not unusual—other individuals were sent to observe NBC's style of televising a game prior to directing a game themselves—except that Roth was afforded a series of observations, rather than just one, and given the opportunity to practice by directing a portion of a football game before being given the chance to handle an entire game on her own. The criticisms of Roth's performance were legitimate. Roth in fact did miss a touchdown, and lack of communication with the camera crew was a criticism rendered more than once.

Two directors, Clark Jones and Marty Glickman testified as to Roth's capacities as a Sports Director. Jones based his evaluation on Roth's work as an associate director on variety or entertainment shows. Glickman, Roth's friend of forty years, was more generous, saying without qualification that Roth's work as a Sports Director was, in his opinion, excellent. Glickman had little familiarity with Roth's directoral assignments for the last ten years, was unfamiliar with the shows on which Roth has been working since about 1978, and did not recall watching the tape of the football

game Roth directed. Glickman's testimony with respect to Roth's knowledge of sports was unconvincing and was undermined by his admissions that a person knowledgeable in football would know what a crack-back block is, that a person knowledgeable in basketball would know what "posting up" is and that a person knowledgeable in baseball would know who Sparky Anderson is, knowledge which Roth did not possess.

NBC did not have a training program during the time in question. NBC typically evaluated potential Sports Directors based on a single performance following a single observation by the applicant. The suggestions Roth received as a result of her observations and her performance were comparable to the support given others in her position, if not more helpful. The written evaluations of her performance were appropriately requested by the NBC personnel department given the difference in opinion between Roth and NBC regarding her qualifications, and the pending litigation.

The decision not to hire Roth was based upon her lack of background and knowledge in sports and her performance during the observation period. It was not pretextual.

## CONCLUSIONS OF LAW

### The Standard to be Applied

■ In a Title VII case, the plaintiff bears the initial burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination. If the plaintiff succeeds in doing so, the burden then shifts to the defendant to produce evidence which rebuts the accusation of discrimination, by showing that there was a legitimate, non-discriminatory reason for its actions. Finally, if the defendant carries this burden, the plaintiff may respond by showing that the reason asserted by the defendant is merely pretextual. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973)).

■ In order to establish a prima facie case of sex discrimination, the plaintiff must show that (1) she applied for the job in question; (2) she was qualified for the job; (3) she did not receive the job; and (4) the job was held open for or filled by men whose qualifications were the same as hers. *Burdine*, 450 U.S. at 258 & n. 6, 101 S.Ct. at 1096 & n. 6, *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

■ Roth has attempted to cast this case as a "mixed motives" case, asserting that she has presented direct evidence that NBC allowed her gender to influence its decision not to hire her in Sports. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 237–47, 109 S.Ct. 1775, 1784–89, 104 L.Ed.2d 268 (1989) (plurality opinion); *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1568 (2d Cir.1989). If that were true, then the burden of proof—rather than the burden of production—would shift to NBC to demonstrate that its hiring decision would have been the same, absent any discrimination. *See Price Waterhouse*, 490 U.S. at 245–48, 109 S.Ct. at 1788–89 (plurality opinion); *id.* at 272–76gr109 S.Ct. at 1802–04 (O'Connor, J., concurring); *Grant*, 880 F.2d at 1568.[5]

However, the "direct evidence" referred to by Roth is insufficient to establish that her gender played a part in the decision. The fact that Roth had been the object of several sex-stereotyped remarks during her attempts to re-enter Sports—for example, she testified that she was told by several men that she wouldn't want to hear "all that lousy language" or go into locker rooms—is inadequate, because she has not shown that any such remarks were made by those responsible for the decision not to hire her, or that such remarks influenced that decision at all. A comparison of Roth's case with *Price Waterhouse* and *Grant* demonstrates the relative weakness of Roth's "direct evidence" of discrimina-

---

**5.** In contrast, under the test set forth in *Burdine* and *McDonnell,* a plaintiff who succeeds in establishing a prima facie case of discrimination thereby shifts the burden of production to the defendant, but the burden of persuasion remains on the plaintiff.

tion. In *Price Waterhouse,* the employment decision at issue was shown to have been expressly based on written comments which were the result of sex stereotyping. In *Grant,* an age discrimination case, the evidence against the employer included a memo which specified that the employer desired to replace the plaintiff with a "young man ... between 30 and 45 years old." In contrast, Roth has presented no evidence to connect the alleged stereotyped remarks to the decisionmaking process, nor has she established any direct evidence of discrimination beyond the failure to hire and the "inexorable zero." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 1858 n. 23, 52 L.Ed.2d 396 (1977). As the *Price Waterhouse* plurality remarked,

> If the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then she may prevail only if she proves, following *Burdine,* [*supra,*] that the employer's stated reason for its decision is pretextual.

490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12. Because Roth has failed to carry the burden for a mixed motives case, the appropriate standard is the "pretext" standard of *Burdine* and *McDonnell.*

*Roth Lacked Qualification as a Sports Director*

■ Roth has adequately demonstrated that she applied for the position of Sports Director, but has failed to establish a prima facie case of discrimination because she has not shown that she was qualified for the job. Although she had experience in directing and seems to have had ample technical skills, she has not proven that she possessed the requisite sports directing ability. Assuming, without deciding, that her sports expertise was sufficient for her to direct a sports broadcast, Roth simply lacked the creativity and leadership necessary in a Sports Director. Her background in directing studio events did not prepare her for the demands of broadcasting a live sports event, where the Sports Director must both anticipate the action and guide the cameras to capture that action in order to be prepared to deliver images which will satisfy the television audience.

Following her first directing opportunity, Nathanson communicated to Roth that she was not managing the cameras enough, that she should get more involved in directing them rather than simply taking the shots they offered. When she later directed an entire game, Finkel registered a similar complaint, stating that she "tended to be a shot caller, rather than a director." In light of this uncontradicted evidence that Roth simply lacked an ability which was essential for the position of Sports Director, it cannot be said that Roth was qualified for the job.

Of course,

> proof of competence sufficient to make out a prima facie case of discrimination was never intended to encompass proof of superiority or flawless performance. If an employer is dissatisfied with the performance of an employee, he can properly raise the issue in rebuttal of the plaintiff's showing.

*Powell v. Syracuse University,* 580 F.2d 1150, 1155 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). However, where, as here, the employer's evidence relates to the plaintiff's basic competence for the position at issue, it is appropriate to consider evidence which indicates that lack of skill when determining whether a prima facie case of discrimination has been made out. Because this evidence shows that Roth was not qualified for the position of Sports Director, she has not established a prima facie case.

■ Similarly, EEOC has not made out a prima facie case of discrimination, because it has not established that any qualified woman were denied the opportunity to become a Sports Director. Although the fact that no women were hired as Sports Director gives rise to an inference of discrimination—"the inexorable zero" as described in—that inference is weak in light of the very limited number of openings for Sports Director positions. Without a showing that at least one qualified woman applied for a

Director position and was denied, EEOC cannot establish a prima facie case.

### The Reasons For Refusing to Hire Roth as Sports Director Were Not Pretextual

Alternatively, even if Roth was qualified to be Sports Director, so that a prima facia case was established, NBC has presented legitimate non-discriminatory reasons for hiring its Sports Directors. Although the men who were selected as Sports Directors over Roth may not have had the absolute length of experience in television that she did, each of them demonstrated superior ability in the specific skills required of a Sports Director. In particular, Gonzalez, Gunts, and Rosenberg each demonstrated the creativity and initiative necessary to succeed as Sports Directors—qualities which both Nathanson and Finkel had found lacking in Roth's directing opportunities. Roth has not proven that NBC's expressed reasons for hiring these three men were pretextual.

### The Reason For Refusing to Hire Roth as Associate Director Was Not Pretextual

█ With respect to the position of associate director, however, Roth has established a prima facie case of discrimination. Assuming that she was qualified to fill this position, and she actively sought such a position in 1988 for the Olympic Games,[6] one of the two available positions was held open for a man instead of Roth. These elements are all that is required to state a prima facie case under *McDonnell* and its progeny. 411 U.S. at 802, 93 S.Ct. at 1824.

NBC's rebuttal is that Roth was passed over for the associate director position for the weightlifting events in Seoul in favor of a more qualified candidate. "With some objective measure for the comparison, ... the decision that one potential employee possesses superior ability and is better qualified than another" is a legitimate business decision. *Ibrahim v. New York State Department of Health*, 904 F.2d 161, 167

(2d Cir.1990). The comparison here, between an applicant with limited sports broadcasting experience and no demonstrated knowledge of weightlifting and one with broadcasting experience from the prior Winter Olympics who had been recommended for the position by the producer of the event, satisfies the *Ibrahim* requirement of being a legitimate business decision.

Roth has not demonstrated that this proffered justification is a pretext. Although she suspected that her interview with Ewert was merely a set-up because of her litigation against NBC, Ewert in fact had no knowledge that her lawsuit was still ongoing at the time of the interview. His refusal to hire her as a logger or runner for the Olympics was based on legitimate business concerns, both for NBC as a whole and for the Olympic sports broadcasting endeavor. Thus although Roth may have been qualified for an Associate Director position, NBC had valid non-pretextual reasons for not offering her the job.

█ EEOC's claims relating to Associate Director positions in Sports also fails, because aside from Roth EEOC has presented no evidence of qualified women being denied positions which were held open for men of equivalent qualifications. As for Roth, of the two positions which she applied for, one was filled by a woman and the second, as discussed above, was given to a man with better qualifications than Roth.

### No Prima Facie Case of Discrimination in Hiring Freelance Directors Has Been Established

█ Finally, in view of the failure of either plaintiff to establish that a request for a freelance director post had been made by a qualified woman and rejected in favor of a man, both plaintiffs have failed to meet their initial burden. *McDonnell*

---

**6.** Roth asserts that her efforts to get a job in Sports constituted an application for an Associate Director position long before her meeting with Ewert in 1988. However, she has not established that she ever explicitly stated that she would like or would accept such a position. In this situation, NBC was justified in treating Roth's efforts to become a Director as applications for that position alone.

*Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94.

*Costs*

 As the prevailing party NBC is entitled to its costs in defending this action under Rule 54(d), Fed.R.Civ.P. Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), also authorizes the court, in its discretion, to award reasonable attorneys' fees to a prevailing defendant. However,

> [S]uch a situation represents the exception rather than the rule. A prevailing defendant may be awarded discretionary attorneys' fees only if the plaintiff's lawsuit was brought in bad faith or for harassment purposes, or was "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."

*Moore v. National Association of Securities Dealers, Inc.,* 762 F.2d 1093, 1098 (D.C. Cir.1985) (quoting *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)) (footnote omitted). Although NBC is the prevailing party here, the preceding discussion establishes sufficient merit to warrant a denial of any application for attorneys' fees.

### CONCLUSION

Roth has not established a prima facie case of discrimination with respect to the position of Sports Director. Alternatively, if a prima facie case was established, NBC has demonstrated legitimate non-discriminatory reasons for not making Roth a Sports Director, and she has not proven that these reasons were pretextual. EEOC has not shown discrimination in the hiring of Sports Directors because it has not shown that a qualified woman applied for the position and was rejected in favor of a man.

Although Roth may have established a prima facie case of discrimination regarding the Associate Director position at the 1988 Olympics, NBC has presented valid non-discriminatory reasons for selecting a man as Associate Director for the weight-lifting event, and Roth has not proven that those reasons were pretextual. EEOC has not shown discrimination in the selection of Associate Directors because, aside from Roth, it has not shown that any qualified woman applied and was rejected in favor of a man, and because Roth's rejection was supported by valid, non-discriminatory reasons.

Neither Roth nor NBC has shown any discrimination in the assignment of freelance directing opportunities because there was no evidence that any women had sought such an assignment and was denied the position in favor of a man.

NBC will be awarded its costs in defending this action, excluding attorneys' fees.

Judgment will be entered on notice with costs.

It is so ordered.