Judith DONALDSON, Plaintiff,

v.

**MERRILL LYNCH & CO.,
INC., Defendant.**

No. 90 Civ. 8037 (RWS).

United States District Court,
S.D. New York.

May 18, 1992.

Lilly Sullivan Purcell Barkan & Junge, P.C., New York City (Philip S. Ross, of counsel), for plaintiff.

Orrick, Herrington & Sutcliffe, New York City (Stuart H. Bompey, Joseph M. Cohen, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Plaintiff Judith Donaldson ("Donaldson") brought this Title VII action against her former employer, Merrill Lynch & Co., Inc. ("Merrill") alleging that she was dis-

charged from her position at Merrill on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* Merrill now moves for an order pursuant to Rule 56, Fed. R.Civ.P., dismissing the complaint. In the alternative, Merrill moves to strike Donaldson's jury demand and request for liquidated damages. For the following reasons, the motion for summary judgment is granted.

## The Parties

Judith Donaldson is a female who resides in New Jersey. Prior to June 28, 1989, Donaldson was employed as an Associate in the Institutional Marketing Group of the Institutional Sales Division of the Capital Markets Sector of Merrill Lynch & Co. Merrill is a Delaware corporation licensed to do business in New York as a brokerage firm.

## Prior Proceedings

After exhausting her administrative remedies, Donaldson filed a timely complaint on December 17, 1990. Merrill filed the present motion for summary judgment on November 1, 1991. Oral argument was heard, and the motion considered fully submitted on February 6, 1992.

## Background

Donaldson was hired by Merrill in August 1987 for the position of Associate in the Business Analysis Group of the Strategic Development and Marketing Department in the Capital Markets Sector of Merrill. At the time she was hired, Donaldson was a doctoral candidate in biology at Harvard University, with an undergraduate degree in biology and a master's degree in Zoology. Prior to her employment by Merrill, Donaldson had been employed as a wildlife biologist for the Northwest Territories Wildlife Service, as director of research for an Eskimo organization in the Northwest Territories and as an expediter for a mining company. It is undisputed that Donaldson at no time has held an MBA degree. In fact, Merrill recruited Donaldson out of Harvard pursuant to a program instituted in the fall of 1986 to recruit graduate students from non-MBA programs. Donaldson admits that she had no experience in the securities industry, had never performed financial analytical work and had not received training in this area prior to joining Merrill. Her only business education was an accounting course.

In or about June 1988, Donaldson became an Associate in the Institutional Marketing Group of the Institutional Sales Division of Merrill's Capital Markets Sector. At that time, the Institutional Marketing Group, at all relevant times headed by Hans Hawrysz ("Hawrysz"), was subdivided into seven sub-departments: EIS/Securities Pricing, Marketing Information Systems, Professional Training and Development, Research and Market Development, International Marketing, Taxable Fixed Income Sales and Institutional Sales. Relevant here are the Marketing Information Systems Department, headed by Christopher Kuehne ("Kuehne") and the Research and Market Development Department, headed by Craig Cadmus ("Cadmus") as of March 1988. The function of the former department was to provide "internal" support to the different divisions of the Capital Markets Group; the function of the latter was to provide "external" support. As described by Merrill, "internal" support entails improving the quality of Merrill's data base management and internal reporting system for the financial consultants selling Merrill products to the institutional marketplace; "external" support entails the identification of potential institutional clients and the expansion of existing institutional business through marketing research and analysis of different products offered and industries serviced by Merrill Lynch Capital Markets.

Initially, Donaldson was positioned in the Marketing Information Systems Department under Kuehne. Although Donaldson was Kuehne's direct report, she received project assignments from Hawrysz, Cadmus and the other department managers in the Institutional Marketing Group during the latter half of 1988. The one formal evaluation of Donaldson submitted on this motion, prepared by Kuehne for the year 1988, assessed her work as "excellent,"

while indicating that knowledge of products was an area for "performance improvement."

In January of 1989, Donaldson was transferred into the Research and Market Development Department because her analytical and statistical skills were viewed as more appropriate for that department. A Jan Moran simultaneously transferred from the Research and Market Development Department to the Marketing Information Services Department. As of Donaldson's transfer, the Research and Market Development Department was staffed by Donaldson, Josephine Dekkers ("Dekkers") and Rafael Berber ("Berber"), all associates, Danielle Gallina, a secretary, and Cadmus, a Vice President and the manager of the department.

According to Cadmus, at all times Donaldson's direct supervisor in the Research and Market Development Department, Donaldson performed, and indeed was only "capable" of performing "secondary" research. As defined by Merrill, such research involves statistical analysis of data generated by another source, such as Merrill's own data base or an outside marketing research firm. By contrast, "primary research," as defined by Merrill, involves the development of the surveys and questionnaires used to elicit the data to be analyzed. According to Merrill, a good deal of Donaldson's time was devoted to analyzing data from the outside marketing research firm of Greenwich Research Company ("Greenwich"). Cadmus concedes that Donaldson also performed primary research functions on at least one project during the six-month period in which she worked for him. Specifically, he admits that she designed "from scratch" the surveys and questionnaires used in an internal study of Account Executives in the Equity Markets Division.

Due to financial pressures resulting from the stock market crash in October 1987 and a $370 million trading loss in April 1987, Merrill implemented a series of cost containment measures between 1988 and the present. Among those measures was a hiring freeze beginning in 1988 that has continued and a reduction-in-force program ("RIF") in the Capital Markets Sector implemented in late December 1988 or early January 1989. As part of this program, the Capital Markets Sector was to reduce its headcount by approximately 500 employees from January 1989 through June 1989. Each division within the Capital Markets Sector was assigned a target headcount level to be reached by the end of June 1989. Over the first half of 1989, the Institutional Sales Division was to reduce its total headcount from 922 to 855. By July 17, 1989, Institutional Sales had lowered its headcount to 847. According to both Cadmus and James Baker ("Baker"), then Manager of Human Resource Services for the Capital Markets Sector, the "mandate" during the RIF was to "consolidate *and upgrade* the organization." Baker Aff. ¶ 16 (emphasis in original).

According to Cadmus, in June 1989, Hawrysz directed him to do his part in the RIF by reducing his staff by one Associate. Kuehne was directed to reduce the headcount in the Marketing Information Services Department by two members. As manager of his department, it was within Cadmus's discretion to decide which of his Associates to terminate. Although Merrill imposed no specific criteria for making this determination, the voluntary "Staff Reduction Guidelines" (the "Guidelines") published by Capital Markets Human Resources Department provided that the first step in the termination process was for the "[m]anager [to] review[ ] staff and make[ ] termination decisions based on assigned targets and employee's individual performance relative to the rest of the group." Cadmus Aff. Ex. C. The Guidelines then set forth an approval process for reviewing termination decisions prior to their execution.

Cadmus claims that, after assessing the skills of Donaldson, Dekkers and Berber, he concluded that the termination of any one of them would create a deficiency in a skill critical to the effective functioning of the department. Donaldson had strong quantitative skills and knowledge of research methodology; Dekkers had an MBA with a specialization in marketing, was a sound technical writer of marketing plans

and brochures; and Berber had strong analytical skills and an MBA and had developed an expertise in finance. On the other hand, Cadmus was of the opinion that Donaldson lacked primary research skills and an adequate understanding of the financial services industry, although he was aware that she had considerable primary research experience, including survey design, in the field of wildlife biology; that Dekkers was weak in primary research and statistics and lacked computer skills and financial aptitude; and that Berber's written communication skills and knowledge of survey methodology was inferior to that of Donaldson and Dekkers.

Meanwhile, Cadmus contends that the shifting needs of the departments Research and Market Development served warranted a deemphasis on secondary research (such as Greenwich) and the development of primary research capabilities in his department. In July, 1988, before Donaldson joined the department, Cadmus reported in a memorandum to Hawrysz that there was a "gap" in primary research skills in his department. Again in January 1989, after Donaldson joined the department, he stated in a memorandum to Hawrysz that a position remained "open" in the department for an Associate with primary research capabilities. Prior to writing the latter memorandum, Cadmus had sponsored an attempt to hire his former colleague Robert Ryan ("Ryan") into his department to fill this position. Subsequently, Hawrysz refused Cadmus authorization to extend the offer because of the hiring freeze. Previously, Cadmus had offered Ryan an position in March 1988, which Ryan declined.

Unable to select one Associate for layoff, Cadmus decided that the only way to maintain, if not upgrade, the performance level of the department would be to terminate both Donaldson and Dekkers and hire Ryan, who could assume that portion of their duties that continued to be relevant while at the same time bringing primary research capabilities to the department.[1] Cadmus candidly admits that he specifically

had Ryan in mind in devising how to achieve the headcount reduction. Ryan was experienced in performing both primary and secondary market research in a private industry setting, had an MBA degree and strong analytical, written and oral skills. Cadmus was familiar with Ryan's skills and capabilities because he had worked closely with Ryan in another department at Merrill for two years prior to becoming the manager of Research and Market Development. Cadmus thus eliminated two Marketing Research Associate positions and created the position of "Marketing Research Strategist." The job description, admittedly tailor-made to Ryan's qualifications, provided that the candidate should be:

> Experienced in managing primary research studies on financial services in the Institutional market; conducting secondary research; developing marketing strategies. Must possess strong analytical, written and oral skills. MBA in finance/marketing.

Donaldson was terminated on June 28, 1989, effective immediately, although she remained on the payroll for some time thereafter. The reason stated on her Termination Documentation Form was "Headcount reduction. The position of Market Analyst has been consolidated into the existing staff as part of a department restructuring." Donaldson Aff. Ex. 17. At approximately the same time, Ryan was hired as Marketing Research Strategist. In this action, Donaldson claims she was terminated not because of the RIF but because she is a woman.

*Discussion*

1. *Standard for Summary Judgment*

Summary judgment is appropriate only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). In determining whether to grant a motion or summary judgment, the court is not "to weigh the evidence and

---

**1.** Donaldson does not contend that the decision to retain Berber over Dekkers and herself was discriminatory.

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. The motion must be denied if there is a dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. at 2510–11 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).

■ The moving party bears the initial burden of establishing the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, if the non-moving party would bear the burden of proof on a claim at trial, the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of such claim. *Id.* at 325, 106 S.Ct. at 2553. To defeat the motion, the non-moving party must show more than that "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). This is particularly true for those issues on which the non-moving party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *see also Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (plaintiff in Title VII action bears ultimate burden of proving discrimination). Although Title VII cases often turn on the issue of an employer's intent or state of mind, such cases may be resolved on summary judgment where appropriate. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988); *Meiri v. Dacon*, 759 F.2d 989, 997–98 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Scott v. Federal Res. Bank of N.Y.*, 704 F.Supp. 441, 446 (S.D.N.Y.1989) (Sweet, J.).

### 2. *Shifting Burdens in Title VII Cases*

The plaintiff in a Title VII case always retains the ultimate burden of proving intentional discrimination. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Nevertheless, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the familiar intermediate shifting burdens of production that function to "sharpen vague allegations of discrimination and flush out true reasons that prompted an employer's action." *Dister*, 859 F.2d at 1112.

■ The plaintiff bears the initial burden of establishing by a preponderance of the evidence, a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. If the plaintiff carries her burden, thus creating a rebuttable presumption of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* The employer's burden is one of production only; it need not persuade the court that it was actually motivated by the proffered reason, but rather must put forth evidence that raises an issue of fact as to whether the reason was discriminatory. *Burdine*, 450 U.S. at 254, 256, 101 S.Ct. at 1094, 1095; *Board of Trustees v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978); *Meiri*, 759 F.2d at 996. If the defendant produces such evidence, the presumption of discrimination disappears and the burden again shifts to the plaintiff to show that the articulated reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26. This burden "merges with the ultimate burden of persuading the court that she has been the victim of discrimination." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

### A. *Donaldson's Prima Facie Case*

■ The burden of establishing a *prima facie* case is not onerous. *Burdine*,

450 U.S. at 253, 101 S.Ct. at 1093; *Sweeney v. Research Found. of State Univ.*, 711 F.2d 1179, 1181 (2d Cir.1983). In the context of an alleged sexually discriminatory discharge, the plaintiff need only show that (1) he or she is a member of a protected class; (2) he or she was qualified for the position from which he or she was discharged; (3) he or she was terminated; (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Sweeney*, 711 F.2d at 1185; *Pena v. Brattleboro Retreat*, 702 F.2d 322, 324 (2d Cir. 1983). An inference of discrimination can be made if the plaintiff's position was held open for or filled by an individual outside the protected class, in this case, a man. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Montana v. First Fed. Sav. & Loan Assoc.*, 869 F.2d 100, 104 (2d Cir.1989). Where the termination arises in connection with a reduction-in-force, the fourth element may be modified to require only a showing by direct, statistical or circumstantial evidence supporting an inference of discrimination on the basis of sex. *Montana*, 869 F.2d at 104.

■ There is no dispute that Donaldson is a member of a protected class, that she was terminated and that a newly-hired male, Ryan assumed a substantial portion of her duties.[2] Nor is there any disagreement as to whether Donaldson was qualified as a Marketing Research Associate, the position she occupied prior to her termi-

nation.[3] Merrill contends, however, that Donaldson has not established a *prima facie* case because she was not qualified for the newly-created position of Marketing Research Strategist.

Whether Donaldson was qualified for the "new" position is neither the relevant nor the proper inquiry at this stage, as perhaps it would be were Donaldson asserting a claim of discriminatory failure to promote or discriminatory failure to hire. However, Donaldson has not asserted that she sought and was denied the position of Marketing Research Strategist in favor of Ryan. Rather, Donaldson claims that she was discharged from her position as Marketing Research Associate for sexually discriminatory reasons. Thus, the appropriate inquiry is whether she was qualified for the position from which she was discharged.[4]

Because Donaldson has established a *prima facie* case, the burden of production now shifts to Merrill to articulate a legitimate, nondiscriminatory reason for Donaldson's termination.

**B.** *Merrill's Legitimate, Nondiscriminatory Reason*

■ Merrill claims that Donaldson was terminated because of the elimination of her position in the RIF and concomitant change in focus of the Research and Market Development Department. Because

---

**2.** Merrill concedes that Ryan assumed at least 50% of Donaldson's responsibilities. This case thus presents a seemingly unique hybrid in that Donaldson was terminated in connection with a reduction-in-force *and* was replaced by an individual outside the protected class. *See Nordquist v. Uddeholm Corp.*, 615 F.Supp. 1191, 1196–97 (D.Conn.1985) ("reassignment" of discharged ADEA plaintiff's work sufficient to meet "replacement" requirement of *prima facie* case). Because it is permissible to draw an inference of discrimination from the latter fact, it is unnecessary for Donaldson to make a further factual showing on the fourth element.

**3.** Merrill does not assert that Donaldson would have been terminated if not for the RIF. "[T]he essence of a RIF is that competent employees who in more prosperous times would continue and flourish with a company may nevertheless have to be fired.'" *McBride v.*

*Princeton Univ.*, No. 90 Civ. 838, 1991 WL 66758, 1991 U.S. Dist. LEXIS 5677 (D.N.J. Apr. 24, 1991) (quoting *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir.1988)).

**4.** This is not to say that the qualifications of a given position cannot change over time with the changing needs and goals of the employer's business, making one who was "qualified" last year "unqualified" today. *See Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1425 (7th Cir.1986). Nevertheless, in *Dorsch*, the issue was whether a *salesman* skilled in generating high sales volumes but not effective in generating new customers was still qualified to be a *salesman* when the business's priorities shifted to developing new customers. Here, by contrast, the issue Merrill attempts to pose is whether Donaldson, undisputedly qualified for the Marketing Research Associate position she held, was qualified for a *different* position.

this is a legitimate, nondiscriminatory reason, *see Montana,* 869 F.2d at 105 (elimination of a position due to reduction in force is legitimate, nondiscriminatory reason); *Dister,* 859 F.2d at 1115; *cf. Krulik v. Board of Educ.,* 781 F.2d 15, 21 (2d Cir. 1986), Donaldson must now establish that this reason is merely a pretext for sex discrimination.

### C. *Donaldson's Showing of Pretext*

At trial, Donaldson may satisfy her ultimate burden of proving pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Gibson v. American Broadcasting Cos.,* 892 F.2d 1128, 1132 (2d Cir.1989). In opposing the motion for summary judgment, Donaldson need not *prove* that the asserted reason is pretextual but rather must produce evidence from which the court could draw an inference of discrimination on either of these bases. *See Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir.1989).

■ Donaldson has failed to raise an inference of discrimination under either the "direct" or the "indirect" method of proof. Her "direct" evidence consists of the allegations that Cadmus: (1) had had three women assigned to him when he took over the department, one of whom subsequently resigned and one of whom transferred out of his department; (2) "seemed uncomfortable" working with women; (3) would talk to men in the department but leave notes for the women; (4) normally would not invite women to meetings, and had lunch each day with Berber but never invited women; (5) made "sexual comments" about his children's governess; and (6) at a staff Christmas party in 1988 gave a secretary a book entitled "How to Please your Man in Bed."

Even if true, these allegations of sexism are too vague and isolated to raise an inference that sex discrimination was the more likely motivation for Donaldson's termination. Importantly, as Donaldson herself admits, none of the alleged behavior was even directed at her. Donaldson Dep. at 159 (she did not "particularly" experience any of the allegedly sexist behavior described). *See Haskell v. Kaman Corp.,* 743 F.2d 113, 120 (2d Cir.1984); *Briskin v. Schenley Indus., Inc.,* No. 86 Civ. 8338 (LMM), 1990 WL 209348, 1990 U.S. Dist. LEXIS 16768 (S.D.N.Y. Dec. 13, 1990). Moreover, Donaldson has established no connection between any of these alleged incidents and the decisionmaking process that led to her termination. *See E.E.O.C. v. National Broadcasting Co.,* 753 F.Supp. 452, 465–66 (S.D.N.Y.1990).

Equally unavailing are Donaldson's attempts to raise an inference that Merrill's asserted explanation for her termination is unworthy of credence. Essentially, she claims that there are three grounds upon which a jury could disbelieve Merrill's assertion that she was terminated due to the elimination of her position in connection with the RIF and concomitant shift in focus of the Research and Market Development Department. First, she claims that a trier of fact could conclude that the RIF, both as a whole and within the Research and Market Development Department, was a sham because the headcount in the Institutional Sales Group remained constant at 34 members from February 1989 to July 1989. Secondly, she claims that Cadmus's creation of the Marketing Research Strategist position, for which Ryan was hired, casts doubt on the assertion that her position was eliminated. Thirdly, Donaldson asserts that Cadmus failed to follow established procedures in terminating her and falsely informed her that her termination was not due to her performance.

■ In assessing the credibility of Merrill's proffered reason, "it is not the function of the fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal." *Dister,* 859 F.2d at 1113; *see Meiri,* 759 F.2d at 995. The reasons tendered need not be well-advised, but merely truthful. *Dister,* 859 F.2d at 1116. Nevertheless, [t]he reasonableness or lack thereof of an employer's explanations is probative

[of pretext]. Thus "[t]he more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as pretext." For example, evidence that the claimant was considerably more qualified for the contested position than the person selected would be probative of pretext because it is unlikely that an employer would exercise its good faith business judgment in such a manner. Conversely, the lack of a significant discrepancy between the qualifications of the claimant and the successful applicant would not be probative of pretext because an employer may choose from among several qualified candidates without violating [Title VII].

*E.E.O.C. v. Trans World Airlines, Inc.,* 544 F.Supp. 1187, 1220 (S.D.N.Y.1982). Where the employee's claim is that the employer "used the structural reorganization as a cover for discriminatory action, a federal court ... is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith." *Montana,* 869 F.2d at 106. The trick is to distinguish between a "poor business decision and a reason manufactured to avoid liability." *Dister,* 859 F.2d at 1116.

■ As to the first issue raised by Donaldson, the parties' submissions unequivocally establish that a staff reduction program was implemented in the Domestic Institutional Sales Division in late 1988 or early 1989 and that the objectives of that program not only were met, but were surpassed by July 1989. *See* Baker Aff. ¶ 8; *id.* Ex. B (projected headcount was 855; actual headcount as of July 1989 was 847). In the face of this uncontroverted fact, the constant headcount in the Institutional

Sales Group, a component of the Domestic Institutional Sales Division, simply could not cause a trier of fact to conclude that the RIF as a whole was a sham.

Similarly, the fact that three men (in addition to Ryan) joined the Institutional Marketing Group following Donaldson's termination does not permit the inference that the RIF was a cover-up for ridding Merrill of its female employees, as Donaldson claims. As discussed above, the targeted net reduction in headcount in the Division was achieved, dispelling any negative inference as to the RIF as a whole. Moreover, as to the Research and Market Development Group specifically, the unrebutted evidence establishes that, with the exception of Ryan, none of these men joined that Group.[5] Thus, on the basis of this fact, the trier of fact could not conclude that the asserted mandate for a headcount reduction in Research and Market Development was unworthy of credence.[6] Finally, the addition of these men to the Institutional Sales Group does not raise an inference of discriminatory motive on the direct evidence theory since it is uncontested that men, as well as women were terminated in connection with the RIF. *See* Donaldson Exs. 6, 8, 12.

■ Donaldson's most promising evidence of pretext relates to the creation of the Marketing Research Strategist position for which Ryan was hired. Specifically, Donaldson claims that her position was not really eliminated but simply renamed and filled with a man, calling into question the *bona fides* of the purported elimination of her position in connection with the RIF. There are two ways in which Donaldson could create such an inference. First, Don-

---

5. The one male newly hired into the Group, James McFarland, joined the Professional Training and Development Department, as did David Harrison, a transfer. The third man, David Officer, transferred into the International Sales Department of the Group.

6. Donaldson also cites the "transfer" of Mark Stoermer into the Research and Market Development Department following her termination. However, the unrebutted evidence is that Stoermer never joined the department but merely reported to Cadmus while continuing to work substantially for Mark Baker in the Taxable

Fixed Income Sales Department. While the evidence does show that Stoermer eventually did 25% of his work for Cadmus, an examination of Stoermer's Monthly Objectives and Accomplishments memoranda reveals that he did not perform functions previously performed by Donaldson. *See* Donaldson Ex. 19. To the extent that Stoermer did perform any of Donaldson's prior functions, this is wholly consistent with Merrill's assertion that Donaldson's duties were absorbed by existing staff. *See* Donaldson Ex. 17.

aldson could establish that the creation of the position was itself concocted without a legitimate business objective. Second, she could establish that the demands of the "new" position merely duplicated those required of her as a Marketing Research Associate and that there was no legitimate reason for hiring Ryan to fill the position in her stead.

The facts preclude the inference that the need for an Associate capable of performing primary research was "manufactured to avoid liability." Cadmus documented his perception that the Market and Research Development Department lacked primary research capabilities needed to affect a warranted shift in focus approximately one year before Donaldson's termination. He attempted to fill this position on two occasions prior to the termination: once before Donaldson became associated with the department and once afterwards.[7] *Cf. Dister,* 859 F.2d at 1116 (proffered explanation that termination resulted from economic cutbacks was not unworthy of credence, where "[t]he need for Dister's position had been called into question by late 1983 [one and one-half years prior to plaintiff's termination]"). Furthermore, Donaldson has not pointed to facts raising the inference that the creation of the position was not wholly consistent with management's uncontested mandate to "consolidate and upgrade" during the RIF.

Donaldson has also failed to present proof that the Marketing Research Strategist position was not "new," that is, that it did not involve skills or functions distinct from those required of her as a Marketing Research Associate. While the facts certainly justify the inference that a large part of the Marketing Research Strategist's work involved the performance of the same set of functions either performed by Donaldson as a Marketing Research Associate or of which she was capable, *see* Cadmus Aff. at 159–60 (approximately 80% of Ryan's time devoted to functions previously performed either by Donaldson or Dekkers; Donaldson "may" have been able to perform all of Dekkers's duties); *id.* at 127 (Donaldson possessed requisite "analytical, written and oral skills" for the new job), Donaldson has not rebutted Merrill's evidence that a significant component of the new position required primary market research and business strategy skills that were not a part of her job.

A comparison of Ryan's and Donaldson's Monthly Objectives and Accomplishments memoranda[8] reveals that a portion of Ryan's time was devoted to survey design and business strategy, whereas no mention of such activity appears on Donaldson's memoranda. *Compare* Donaldson Exs. 5, 11 (Donaldson) *with* Cadmus Ex. I (Ryan). While Donaldson claims that she participated in the design of several surveys, she testified in her deposition that none of her work required her to do "focus group marketing research" or to "draft survey programs from scratch," Donaldson Dep. at 166, and that, although she thought she had designed a taxable fixed income survey, on second thought "[m]aybe I designed the analysis of it, design software." *Id.* at 166–67.[9] In addition, she conceded that "[o]ne [part of primary research] that it appears now I may not have done is design the initial survey.... These were surveys that already were in place when I came into Mr. Cadmus's department." Donaldson Dep. at 170–72. Viewing all of the evidence in the light most favorable to Donaldson, however, the submissions establish that she did participate in the design of an Account Executive survey and

---

7. Cadmus's identification of an "open" position in primary research subsequent to Donaldson's arrival in the department dispels the inference that Donaldson filled the "gap" previously identified by Ryan in his July 1988 memorandum to Hawrysz. *See* Donaldson Dep. at 168 (Donaldson had already transferred into Research and Market Development Department when Cadmus wrote January memorandum to Hawrysz).

8. Donaldson conceded that these memoranda accurately reflected the projects she worked on. Donaldson Dep. at 165.

9. Donaldson has presented no objective facts that establish that she participated in the survey design stages of the taxable fixed income survey. Indeed, another Merrill employee, Stoermer, cannot recall who developed the questions for that survey. Stoermer Dep. at 22–24.

may have participated in designing an "equity probe."

Even assuming that Donaldson performed primary research functions on two occasions during her tenure under Cadmus, Donaldson has not presented evidence from which a trier of fact could conclude that she was as qualified as Ryan to assume the new primary research demands of the new position. Though Cadmus's subjective evaluations of Donaldson's qualifications alone are insufficient to defeat an inference of pretext, *see Sweeney,* 711 F.2d at 1185 (subjective evaluation by employer may mask discrimination), the objective evidence on the record establishes that Ryan was more qualified for the job, as described. Specifically, while Donaldson had considerable experience in survey design in the field of wildlife biology prior to her employment at Merrill,[10] she concedes that she had no prior experience or training in the securities industry. *See also* Donaldson Ex. 4 (Donaldson's resume). From the time of her initial interviews with Merrill, her knowledge of the industry was consistently noted as a weakness. *See* Donaldson Ex. 9 (interviewers all rated Donaldson's "Knowledge of Investment Banking" as "Poor"); *id.* Ex. 7 (evaluation by Kuehne specifying "area[ ] for performance improvement" as "Learn more about products"). Finally, Donaldson did not have the requisite education for the new position. *See McBride v. Princeton Univ.,* No. 90–838, slip op., 1991 WL 66758, 1991 U.S. Dist. LEXIS 5677 (D.N.J.1991) (no issue of fact as to pretext where "disparity in educational background alone [between job from which plaintiff discharged and job subsequently posted] would eliminate McBride as a viable candidate for the new position"). In contrast, Ryan had approximately six years of experience in the securities industry and an MBA degree in Marketing. Cadmus Ex. Q (Ryan's resume).

This case is thus strikingly similar to *E.E.O.C. v. National Broadcasting Co.,* 753 F.Supp. 452 (S.D.N.Y.1990) (Sweet, J.) (hereinafter *"Roth"*), *aff'd,* 940 F.2d 648 (2d Cir.1991). There, the plaintiff, alleged that the defendant ("NBC") had failed to employ her as a Sports Director on the basis of her sex. This court concluded that the plaintiff had failed to establish a *prima facie* case of discrimination on the grounds that she was not qualified as a Sports Director. Although it was undisputed that the plaintiff had extensive experience and distinguished qualifications in television directing, the evidence also showed that she lacked the skills necessary to directing television coverage of live sports events. *Id.* at 466. Analogously, while the evidence presented on this motion establishes Donaldson's qualifications to design surveys in the field of wildlife biology, the undisputed evidence does not allow the inference that she was as qualified as Ryan to perform this function in the securities industry.

Given Donaldson's failure to present evidence that the need for primary research was concocted, that the Marketing Research Strategist position did not have "new" components responding to that need, or that she was as qualified for that position as Ryan, a trier of fact could not conclude that Merrill's assertion that she was terminated due to the elimination of her position is "so ridden with error," "implausible" or "so lacking in merit as to call into question its genuineness." *Dister,* 859 F.2d at 1116; *Sparks v. Pilot Carriers, Inc.,* 830 F.2d 1554, 1564 (11th Cir.1987); *Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980).

 Finally, Donaldson claims that Cadmus failed to follow the procedures for termination set forth in the Guidelines, therefore casting doubt on the credibility of Merrill's proffered reason for her termination. Even assuming that Cadmus did fail to follow those voluntary procedures, Donaldson has not articulated a nexus between this fact and the credibility of Merrill's assertion that her position was eliminated due to the reduction in force. Failure to follow voluntary procedures alone does not support an inference of discrimination. *See DiMaso v. Duo–Fast Corp.,*

---

**10.** Eleven of Donaldson's 17 years of primary research experience in wildlife biology involved designing surveys and corresponding questionnaires. Donaldson Aff. ¶ 15.

No. 88–1661, slip op., 1990 WL 165326, 1990 U.S. Dist. LEXIS 14298 (N.D.Ill.1990). Likewise, the fact that Cadmus "falsely" informed her that her termination was not due to her performance is not relevant to the credibility of the asserted reason for her termination.

 I thus find that Donaldson has failed to present facts that raise an inference either that sexual discrimination was the more likely motivation for her termination or that Merrill's articulated reason is unworthy of credence. Parenthetically, I note that, were I to find evidence of pretext, there is no evidence on this record upon which Donaldson could carry her ultimate burden of persuading a trier of fact that her *sex* played any role in the termination decision. I make this observation only parenthetically because the Second Circuit has directed that, at the summary judgment stage in Title VII actions, courts must limit their inquiry to the credibility of the employer's articulated reason and restrain themselves from examining the record for evidence that the pretext is a cover for an impermissible motive.

I submit that such a constraint does violence to *McDonnell Douglas*'s explicit allocation of the ultimate burden of persuasion to the plaintiff in Title VII cases. As noted in dissent in *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 903–04 (3d Cir.1987),

> An employer's proffered reason for terminating an employee may be pretextual without violating the ADEA or any other civil rights statute. An employer motivated by ill-will, nepotism, or unpublicized financial problems in his termination of an employee is just as likely to use a pretextual explanation for his action as is an employer motivated by statutorily-prohibited discrimination.

Given the host of "unfair" though not illegal reasons that might be covered by a pretext, the real-life effect of allowing a plaintiff to carry her ultimate burden by showing pretext, but no evidence of prohibited discrimination, is to shift to the defendant the burden of persuading the trier of fact that it was *not* motivated by impermissible discriminatory animus. *See id.* at

903. The real-life effect of allowing a plaintiff to defeat a summary judgment motion on this basis is to force the parties to go to trial—with its concomitant expenditure of great amounts of time, money and emotion—over a wrong the court ultimately may have no power to redress. *See DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 308 (2d Cir.1986) (employer's conduct in creating job that could be filled only by his female lover though "unfair, simply did not violate Title VII").

*Conclusion*

For the foregoing reasons, Merrill's motion for summary judgment is granted and the complaint dismissed. Submit judgments on notice.

It is so ordered.