Hannelore PASSONNO, Plaintiff,

v.

STATE UNIVERSITY OF NEW
YORK, UNIVERSITY AT
ALBANY, Defendant.

No. 93–CV–1415.

United States District Court,
N.D. New York.

July 6, 1995.

Jack Sissman, Albany, NY, for plaintiff.

Dennis C. Vacco, Atty. Gen. of the State of N.Y., Albany, NY (Richard Freshour, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

McAVOY, Chief Judge.

Plaintiff Hannelore Passonno filed this action pursuant to Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as amended 42 U.S.C. § 2000(e) *et seq.* The plaintiff alleges that she was discharged from her position as an Associate Director of International Student Services at the State University of New York at Albany on the basis of her sex. She further alleges that her sex was the motivating factor in the University's determination not to give her certain "bumping" rights.

The matter of *Passonno v. State University of New York at Albany,* 93–CV–1415, was tried without a jury on May 9, 1995. This Memorandum–Decision and Order constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

Plaintiff Hannelore Passonno (hereinafter "plaintiff") was employed by the State University of New York at Albany (hereinafter "the University") upon her graduation from the same institution in 1969. She started out as an Assistant to the Director of International Programs and, in 1986, progressed to the position of Assistant Director of International Programs. In the latter position, plaintiff was mainly in charge of coordinating the University's international study programs which the University had in conjunction with universities abroad. Since plaintiff was German born and spoke three languages either fluently or proficiently, plaintiff had the ideal skills for her position.

During plaintiff's tenure in the International Programs department, she served under several directors without any incident. This was true until Alex Shane became the Director in 1981. Although the period of 1981 to 1983 was uneventful, problems with Mr. Shane started in 1983, when he had to go to Moscow on business. In Mr. Shane's absence, his secretary, who also served as the office secretary, refused to take orders from the plaintiff who was put in charge of the office in Mr. Shane's absence. Plaintiff attempted to contact Mr. Shane in Moscow to inform him of the problems she was having with his secretary, but such attempts were not successful. After exhausting all possibilities, plaintiff finally approached Mr. Shane's superior, Mr. Simon, to inform him of the difficulties plaintiff was experiencing with the secretary. In turn, Mr. Simon told the secretary to do her job and take orders from the plaintiff.

Upon Mr. Shane's return from Moscow, Mr. Shane was apprised of the situation in the office and was very upset at plaintiff for "going over his head." Mr. Shane thought the problem should have been resolved without involving Mr. Simon, and blamed plaintiff for not handling it herself. With this incident, plaintiff's professional career with the University was forever altered.

From the above-mentioned incident in 1983 and until 1988, Mr. Shane did various things to make plaintiff's life miserable, including putting plaintiff on a time clock when no other professionals were required to do so, requiring a doctor's note for any sick days taken by plaintiff, requiring plaintiff to follow a different disbursement procedure for business trips, and letting other more junior people in the office oversee all of plaintiff's work. Moreover, there was an incident in the office where Mr. Shane had assaulted the plaintiff by grabbing her and putting her against the wall while slurring profanities at her. Grievances based on these incidents were filed on behalf of the plaintiff by the Union representing her.

In February of 1988, plaintiff was transferred from her position to a two part position: clerical work in the Center for Teratology where she worked in the morning and a similar position in the Office of Research where she worked in the afternoon. The two positions were physically located in different buildings. The Union again filed a grievance on plaintiff's behalf. In April of the same year, plaintiff was yet again transferred to the Office of International Student Services as the Associate Director. This position was created especially for the plaintiff, and in this position, she aided foreign students studying in the University with matters relating to

immigration, assimilation and others. The Director for this office was Steven Thompson, and unlike the relationship plaintiff had with Mr. Shane, her relationship with Mr. Thompson was amicable. In fact, Mr. Thompson gave plaintiff glowing evaluations for her performance.

In 1991, New York State, not unlike the rest of the country, was faced with difficult financial times. For the 1991–1992 fiscal year, the State had to cut costs, and the State University system was no exception. More specifically, the State University of New York at Albany was forced to retrench certain positions in order to meet its 1991–92 fiscal budget.

The Vice Presidents within the University were given the responsibility of determining which positions to retrench within their respective areas. Since plaintiff served under the Vice President for Student Affairs, the Court's findings of fact will focus within that area.

Within Student Affairs, a select number of individuals commonly referred to as the "cabinet" were put in charge of proposing possible functions for retrenchment. The term "functions" is used because it is important to note that the cabinet looked into functions instead of individuals when making their determination. Only after determining which functions to retrench, did the cabinet know which individuals would be affected by the determination. The cabinet first looked to retrench functions which were vacant and/or temporarily assigned. The cabinet also attempted to realign positions so that some functions may be moved into revenue producing areas. After that, the cabinet prioritized which functions were considered essential. For example, certain service functions which the cabinet thought were not critical to the operation of the University, and more specifically Student Services, were retrenched—i.e. conferencing services.

After careful consideration, it was determined that five positions were to be retrenched within Student Affairs: four professional positions and one classified position.

After the process of retrenchment was finalized, the Chancellor of the State University system or his designee starts the process of determining the individual "programs" for the retrenched employees in accordance to the collective bargaining agreement between the University and the United University Professions union, which is affiliated with the New York State United Teachers. The agreement gives the Chancellor or his designee great latitude in making this determination. Within the University, the President is designated as the Chancellor's designee. In turn, the President heavily relies on the recommendations made by the person in charge of the labor relations under the collective bargaining agreement, Stephen Beditz.

The determination of one's "professional program" is crucial since one's program determines his or her bumping rights within that program. For example, if an employee's professional program is determined to cover a great area, then the pool of employees subject to bumping rights based on seniority would be greater, thus enhancing the retrenched employee's likelihood to bump. Whereas, if the employee's program is determined to cover only a very limited area, then the likelihood of the retrenched employee being able to bump is likewise limited since the probability of there being an employee more junior to that of the retrenched employee is significantly reduced. Factors considered to determine an employee's professional program include the performance program of the employee, the reporting line of the employee, the physical location of the employee's function, the employee's position on the Functional Organization Chart, and others.

Plaintiff's professional program was determined to be the Office of International Student Services. Plaintiff's designation was very restrictive since there were only two employees within this program—the Director of the Office and the plaintiff. Since plaintiff was the most junior in the program, she had no bumping rights.

Of the five positions retrenched within Student Services, only one employee, Donald Bielecki, was able to bump. Looking to the factors mentioned above, Mr. Bielecki's professional program was considered to be beyond the office in which he was employed,

and therefore, he was able to bump into a different office.

After the retrenchment, plaintiff applied for five different positions within the University but was not extended an offer. A majority of these positions, however, were ultimately filled by other women.

From these facts, plaintiff alleges that the University illegally discriminated against her based on her gender. It is alleged that the retrenchment process took her gender into consideration, and moreover, that her professional program designation was too arbitrary since the University had an unfettered right to designate her program without justifying their determination.

## II. CONCLUSIONS OF LAW

■ Actions brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*,[1] as amended, involve a burden shifting analysis. *Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 43 (2d Cir.1988). First, plaintiff must prove a *prima facie* case of discrimination by a preponderance of the evidence. Second, once plaintiff has presented such a *prima facie* case, the burden then shifts to the defendant to "articulate" some nondiscriminatory reason for the alleged discriminatory action. Finally, in the event that the defendant is able to meet its burden, plaintiff must be given the opportunity to prove by a preponderance of the evidence that the proffered reasons are merely a pretext for discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–254, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1369 (2d Cir.1989). Recently, the Supreme Court has interpreted "pretext for discrimination" to mean not merely a showing of falsity, but a showing of true discriminatory intent by the employer. *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——,

——, 113 S.Ct. 2742, 2753, 125 L.Ed.2d 407 (1993).

■ Now, the court proceeds to examine each of the steps in the burden shifting analysis in order to determine whether the plaintiff has put forth a viable cause of action pursuant to Title VII. We must be mindful that regardless of how these burdens are described, plaintiff retains the ultimate burden of persuading the fact finder. *See Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 161 (2d Cir.1991).

### A. PLAINTIFF'S PRIMA FACIE CASE

■ In order for plaintiff to meet her initial burden of proof, she must show that (1) she was within a protected group, (2) her job performance was satisfactory, (3) there was an employment action disadvantaging her, and (4) the discharge occurred under circumstances giving rise to an inference of gender discrimination. *Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1155 (2d Cir. 1993); *see Hollander v. American Cyanamid Co.*, 895 F.2d 80, 83 (2d Cir.1990).

■ The requirement that plaintiff establish her *prima facie* case serves an important function in Title VII litigation; "it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.... As the Court explained in *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the *prima facie* case 'raises an inference of discrimination only because we presume these acts if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' " *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1094 (citations omitted).

In the case at bar, the first three elements of plaintiff's *prima facie* case are not in dispute; plaintiff, being a woman, is clearly a member of a protected class, plaintiff has satisfactorily performed her duties, and

---

1. Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

 It shall be an unlawful practice for an employer—

 (1) to fail or refuse to hire or to discharge any individual, otherwise to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race color, religion, sex, or national origin; ...
42 U.S.C. § 2000e–2(a)(1).

plaintiff was retrenched from her position and was not given bumping rights due to her program designation. Accordingly, only the fourth element remains for the Court's analysis.

 Under this element, plaintiff is required to produce direct or circumstantial evidence that would lead a "reasonable factfinder to conclude either . . . that defendant consciously refused to consider retaining or relocating [the plaintiff] because of [her sex], or . . . [that] defendant regarded [sex] as a negative factor in such consideration." *E.E.O.C. v. Trans World Airlines, Inc.*, 544 F.Supp. 1187, 1218 (S.D.N.Y.1982) (quoting *Franci v. Avco Corp.*, 538 F.Supp. 250, 256 (D.Conn.1982)). An inference of discrimination can be made if plaintiff's position, or substantial portion thereof, was held open or filled by an individual outside the protected class, in this case, a man. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Montana v. First Federal Sav. & Loan Ass'n* 869 F.2d 100, 104 (2d Cir.1989); *Donaldson v. Merrill Lynch & Co.*, 794 F.Supp. 498, 504 (S.D.N.Y.1992).

Before we turn to our *McDonnell Douglas* analysis, it is important to note that plaintiff is pursuing her discrimination claim under two separate theories: discrimination in the retrenchment process and discrimination in the determination of bumping rights. We first turn to the retrenchment issue.

 Plaintiff has put forth not a scintilla of evidence indicating that her gender played any role in the University's decision to retrench her position. More specifically, of the positions retrenched in the Student Affairs department during the fiscal year in question, an equal number of professional men and women were affected by the determination. The record clearly reflects that certain factors were taken into account by the cabinet when making the retrenchment decision, and that one's gender played absolutely no role in this process. There simply is nothing in the record—in the methodology or in the effect—to indicate that male and female employees were treated differently when retrenchment decisions were made. And, since no inference of discrimination can be drawn, plaintiff has failed to establish the fourth element of her *prima facie* case of discriminatory retrenchment. Consequently, this claim is dismissed.

The Court notes that even assuming *arguendo* that plaintiff did satisfy her *prima facie* case of discriminatory retrenchment, this determination would be of no moment since plaintiff would still fail to establish the third prong of pretext under the *McDonnell* analysis. This is discussed *infra*.

 A different conclusion is reached, however, on the issue of bumping rights. The record reveals that, of those retrenched, the only individual given certain bumping rights was male. From this fact, one can draw an inference of discrimination. It must be kept in mind that "[t]he elements of proof in employment discrimination cases were not intended to be 'rigid, mechanized or ritualistic.'" *Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir.1985) (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)). Rather, they were intended to promote the general principle that plaintiffs in Title VII suits must merely raise an inference of discrimination. *Meiri*, 759 F.2d at 996; *see International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). Thus, plaintiff's burden of proof at the *prima facie* stage of a Title VII case is *de minimis*. *See Meiri*, 759 F.2d at 996.

Since plaintiff has satisfied her *prima facie* burden on the issue of bumping rights, we now turn to the second prong of the *McDonnell Douglas* analysis. This analysis also includes the issue of discriminatory retrenchment, since, as stated earlier, plaintiff's claim on this issue may be dismissed on the alternative ground that plaintiff has failed to demonstrate pretext, *infra*.

### B. THE UNIVERSITY'S REBUTTAL

 Establishment of the *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. In order to rebut this presumption, the employer has the burden of producing evidence that the employee was discharged

for a legitimate, nondiscriminatory reason. *Id.* The defendant, however, "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* (citing *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978)). The *Burdine* Court stated,

> "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted...."

*Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. The strength of the defendant's rebuttal, to a large extent, depends on the strength or weakness of plaintiff's *prima facie* case. *See Lieberman v. Gant,* 630 F.2d 60, 66–67 (2d Cir.1980) (noting relationship between the burden borne by the employee and the employer).

■ In the case at bar, the University's main proffered reason for plaintiff's retrenchment is that plaintiff's function within the University was not considered essential to the daily operation of the University. This determination was made because plaintiff's primary responsibility was to aid foreign students with their transition into American culture. As for plaintiff's inability to bump, the reason given by the University was that her "professional program" was very restricted, and there simply was no one within her program she could bump. In making this determination, the University took into account several nondiscriminatory factors, including the performance program and the reporting line for the plaintiff, the physical location of plaintiff's function, location of plaintiff's box on the Functional Organization Chart, and several others.

As stated earlier, the defendant need not persuade the court that it was actually motivated by the proffered reason, it need only produce evidence that the employee was discharged for a legitimate, nondiscriminatory reason. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. This Court finds that the proffered reasons given by the University for its decision to retrench plaintiff's position and its determination on her professional program are legitimate, nondiscriminatory reasons. The University has thus successfully rebutted plaintiff's presumption of discrimination.

The burden now falls back on the plaintiff to show that the proffered reasons are mere pretext, and that unlawful discrimination was the real reason for plaintiff's retrenchment and professional program designation.

### C. PRETEXT AND UNLAWFUL DISCRIMINATION.

■ "After the employer articulates legitimate, nondiscriminatory reasons for the employee's discharge, the employee must be afforded an opportunity to prove the existence of factual issues demonstrating that the stated reasons were merely a pretext for discrimination." *Meiri,* 759 F.2d at 997 (citing *Burdine,* 450 U.S. at 256–57, 101 S.Ct. at 1095–96). The employee may satisfy this burden by showing that the employer was motivated by a discriminatory reason or that the proffered reason given by the employer was false. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The Supreme Court in *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), heightened the plaintiff's burden in Title VII cases. It is now incumbent on the plaintiff to prove, not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge. *Id.* at ——, 113 S.Ct. at 2753. The plaintiff in this action has failed to show the initial burden of falsity.

■ From the evidence at trial, there simply was nothing submitted tending to show that plaintiff's retrenchment was due to reasons other than the fact that plaintiff's function was not considered essential to the operation of the University. Equally clear was the lack of evidence showing that plaintiff's professional designation was made for reasons other than the factors stated above and taken into account by the University.

Turning first to the retrenchment issue, the Court notes that testimony of a University official was received on the methodology of the retrenchment process. Initially, the University was notified that its budget would be drastically reduced due to the State's fiscal problems. The University in turn notified the Vice Presidents for each department that certain cuts would have to be made. The Vice Presidents then assembled committees to determine how their respective departments could absorb the cuts. Within the Student Affairs department where plaintiff was employed, the Vice President formed what is referred to as the "cabinet." The cabinet consisted of a select number of individuals who were put in charge of proposing the possible functions for retrenchment. This cabinet looked into several different functions and prioritized the functions to be retrenched, starting with vacant positions. When it came to plaintiff's function as the Associate Director of the Office of International Student Services, the cabinet determined that the function was not essential to the operation of the University and placed it on the list for retrenchment.

There is nothing in the record to indicate that the University's proffered reason for retrenching plaintiff's position was anything but truthful. Plaintiff has submitted no credible evidence to indicate that reasons other than what has been proffered by the University played a role in the retrenchment selection process. And, for this reason, plaintiff's discriminatory retrenchment claim must be dismissed.

The same conclusion is reached as to plaintiff's claim that her professional designation was discriminatory. The record reflects that the determination on plaintiff's professional program was made by Stephen Beditz, the person in charge of labor relations under the collective bargaining agreement between the union representing plaintiff and the University. Mr. Beditz looked into several different non-discriminatory factors such as the performance program of the employee, the reporting line of the employee, the physical location of the employee's function, where the employee is on the Functional Organization Chart, and others, to make his determination. When plaintiff's professional program designation was made, Mr. Beditz came to the conclusion that her program was the Office of International Student Services. This limited designation was made after careful review of the above-mentioned factors. There simply was nothing in the record to indicate that the reasons given for plaintiff's professional program designation were pretextual. And, for this reason, plaintiff's discrimination claim based on her professional program designation is also dismissed.

It is worth noting that even if plaintiff was successful in demonstrating that the University's proffered reasons were false, plaintiff's claim would nevertheless fail due to her inability to show that discriminatory animus was the motivating factor driving the University's determination to retrench plaintiff and in designating plaintiff's professional program in such a limited fashion.

Plaintiff spent a significant portion of her case attempting to show the ill-will plaintiff's ex-supervisor Alex Shane had against the plaintiff. Plaintiff contends that Mr. Shane's actions were a manifestation of his discriminatory attitude towards women, and that the University failed to take appropriate steps to discipline him. Plaintiff's contentions do not have evidentiary support and are of no moment to the Court's analysis. First, the record clearly indicates that the turbulence in Mr. Shane and plaintiff's relationship has its genesis in plaintiff "going over Mr. Shane's head" while he was in Moscow, and not in any discriminatory intent on Mr. Shane's part. Mr. Shane's dislike for plaintiff was more a product of revenge than anything else. No matter how distasteful Mr. Shane's actions towards plaintiff were, it must be kept in mind that Title VII gives employees protection from job discrimination and not from mere personal conflicts between an employee and his or her supervisor. And second, even assuming that Mr. Shane acted with discriminatory animus towards plaintiff, plaintiff has failed to submit any evidence connecting Mr. Shane's animus to the University's determination to retrench plaintiff and to give her a limited professional program designation. The evidence shows that

Mr. Shane played no role in either processes. Simply stated, there is nothing in the record which indicates that discrimination played a role in the University's determination in the retrenchment and program designation of plaintiff.

## III. CONCLUSION

For the stated reasons, judgment is entered in favor of defendant State University of New York at Albany, and plaintiff Hannelore Passonno's complaint is dismissed in its entirety.

**IT IS SO ORDERED.**